**UNITED STATES DISTRICT COURT FOR**
**THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **STAR DIRECT TELECOM, INC.** and **UNITED STATES TELESIS, INC.,** )<br>)<br>) | |
| **Plaintiffs,** )<br>) | |
| v. ) | Case No. 05-CV-06734(T)(P) |
| ) | |
| **GLOBAL CROSSING BANDWIDTH, INC.,** )<br>) | |
| **Defendant.** )<br>) | |

**GLOBAL CROSSING BANDWIDTH'S**
**RESPONSE IN OPPOSITION TO PLAINTIFF'S APPLICATION**
**FOR LEAVE TO FILE MOTION TO COMPEL**

**I.    INTRODUCTION**

Defendant Global Crossing Bandwidth ("Global Crossing") respectfully submits this response to Plaintiff's Application for Leave to File Motion to Compel. Not only has Plaintiff United States Telesis, Inc. ("UST") failed to satisfy its burden of "good cause," but the Motion comes after the close of discovery and motion cutoff and after this Court repeatedly warned Plaintiff of the consequences of switching counsel at the tail end of discovery.

Plaintiff relies solely upon Rule 26. Yet, under that Rule, Global Crossing has no duty to supplement its disclosures or discovery responses. In addition, the amounts sought by Global Crossing in this case arose almost exclusively <u>after</u> the Concurrence Memorandum was signed and are the direct result of traffic generated by UST, not Star. So, it is simply incorrect to say, as UST does repeatedly, that the only basis for UST's liability is its inherited obligation to pay Star's invoices under the Concurrence Memorandum.

Moreover, the Concurrence Memorandum <u>was</u> implemented.  UST got Star's grandfathered rates.  No amount of internal Global Crossing emails from 2004 will absolve UST of its liability for its outstanding balance.  As a result, the Motions should be denied.

## II.  FACTUAL BACKGROUND RELEVANT TO THIS MOTION.

In October 2002, Global Crossing and UST entered into a Carrier Service Agreement (the "United States Telesis Carrier Service Agreement"), under which Global Crossing agreed to sell, and United States Telesis agreed to purchase, network transport and other telecommunications services ("Services").  The United States Telesis Carrier Agreement has been amended numerous times since it was first executed.

On December 1, 2000, Global Crossing and Star Direct entered into a Carrier Service Agreement ("the Star Direct Carrier Service Agreement"), under which Global Crossing agreed to sell, and Star Direct agreed to purchase, network transport and other telecommunications services ("Services").[1]

*The Minimum Monthly Usage Requirement*

Under the CSA, UST and Star each originally contracted to purchase certain minimum amounts of wholesale voice telecommunications services from Global Crossing.[2]  Each CSA contained a minimum monthly revenue commitment (CSA at § 3.8).  If UST or Star failed to meet the minimum charge, then UST and Star were required to pay the shortfall.  These

---

[1]  Since the United States Telesis Carrier Service Agreement and the Star Direct Carrier Service Agreement are virtually identical, both agreements will be collectively referred to as the "Carrier Service Agreement" or "CSA."

[2]  Minimum monthly usage charges ("MMUC") are set forth in UST's and Star's respective Carrier Service Agreements.  *See* **Exhibits 1 and 2**, § 3.8.  In essence, they are minimum monthly charges that resellers, including UST, must achieve or they will be subject to shortfall penalties.  The minimum commitment is given in order to obtain lower wholesale rates.  *Id*.

2

minimum commitments are enforceable. *See Global Crossing Bandwidth, Inc. v. OLS, Inc.*, 566 F.Supp.2d 196 (W.D.N.Y. 2008).

### *The "Merger" of UST and Star*

Because Star and UST were having difficulties meeting their respective MMUC requirements, they devised a plan to combine the two entities in order to increase traffic to meet the minimums. *See* Deborah Ward deposition, pp. 12-16 (**Exhibit 3**). In furtherance of this plan, in April, 2004, UST "acquired" Star's business, and, as a result, Star and Global Crossing entered into a Concurrence Memorandum pursuant to which Global Crossing agreed to transfer Star's account and traffic to UST. *See* **Exhibit 4**. Under the Concurrence Memorandum, UST was responsible for payment of Star's invoices and Star's minimum usage commitments. Notably, <u>UST reaped all of the benefits of the Concurrence Agreement</u> as UST immediately began benefiting from Star's lower rates. Even Plaintiffs admit that Star's lower rates was the only item of consequence that UST sought to obtain from the Concurrence Memorandum. Ward Deposition, p. 71 (**Exhibit 3**); Daniels Deposition at pp. 57-63 (**Exhibit 5**). And, following the execution of Concurrence Memorandum, if not before, Star essentially disappeared and <u>all</u> of the traffic being carried by Global Crossing was UST's traffic.[3] *See* Ward Deposition, pp. 13-14, 19; David Shipman Deposition, p. 68 (**Exhibit 6**).

Not surprisingly, no money changed hands when UST "acquired" Star. *See* Ward Deposition at p. 50-51 (**Exhibit 3**), <u>because Star's rates were all UST wanted. There is no dispute that, after the Concurrence Agreement was executed, UST received Star's rate</u>. UST's breach of contract claim, then, reverts to the propositions that (1) invoices were still being

---

[3]   Thus, despite UST's protestations to the contrary (Motion, pp. 4, 9), UST is liable for this traffic with or without the Concurrence Memorandum.

3

1899205.02

addressed to Star; and (2) Global Crossing did not eliminate one of the MMUCs. The first is silly as Plaintiffs admitted that this was no more than an inconvenience, *see* Ward Deposition at pp. 153-154 (**Exhibit 3**), and **did not in any fashion impede or prevent the Star/UST deal from being consummated**. *Id*. at pp. 52, 71-72.[4] The second is simply wrong for, as discussed below, Global Crossing never agreed to eliminate either of the MMUCs.

### *UST Generates Large Volumes of Calls at Star's Rates*

Prior to execution of the Concurrence Memorandum, Star's outstanding invoices with Global Crossing totaled $59,281.51 as of April 28, 2004. *See* **Exhibit 7** at GC000486. In comparison, after execution of the Concurrence Memorandum and after U.S. Telesis began receiving Star's rates, Plaintiffs' outstanding invoices skyrocketed to an average of $100,000-200,000 per month throughout 2005. *Id.* at GC000485-486. Since Star did not have any customers of its own by that time, **all of this traffic belonged to UST and it is UST's responsibility to pay regardless of the Concurrence Memorandum**.

### *UST's Dispute Regarding the Concurrence Memorandum and MMUC Requirements*

Beyond mailing invoices to Star, UST asserts that Global Crossing breached the Concurrence Memorandum by continuing to bill it a minimum usage charge rather than eliminating one of those charges. This is the only dispute ever filed by UST. Global Crossing never agreed to waive a minimum usage charge when it agreed to permit the Star and UST accounts to be combined. By its plain and unambiguous language, the Concurrence

---

[4] David Shipman also noted that, prior to UST's acquisition of Star, Star did not have any traffic: "The Star Direct contract sat dormant for quite some time before I put it into the network. There was a point in time from what I understand that there was no traffic and the contract was not utilized at all." *See* David Shipman Transcript, p. 68 (**Exhibit 6**).

Memorandum preserved all pre-existing contract provisions, including the MMUC provisions. The Concurrence Memorandum states:

> Nothing in this Concurrence Memo should be construed to alter the terms of the Carrier Service Agreement between Global Crossing and Customer, except as specifically stated herein.

See Exhibit 4 at ¶ 10.

In addition, the dispute was filed well out of time. Under the CSA, Plaintiffs were required to file a dispute within 90 business days of receiving an invoice. *See* **Exhibits 1** and **2**, § 4. UST would have learned that Global Crossing had not eliminated an MMUC by the May or June **2004** invoices. Yet, UST did not submit its dispute until **May 9, 2005**, when it submitted its dispute in the amount of $129,633.34 contending that the minimum monthly usage charge requirements for UST and Star were not combined in accordance with the Concurrence Memorandum (the "MMUC Dispute"). *See* **Exhibit 8**. Because this dispute was filed well out of time, it has been waived. *See Easton Telecom Services, LLC v. Global Crossing Bandwidth, Inc.*, 62 A.D.2d 1235, 1237, 877 N.Y.S.2d 809, 811 (4th Dep't 2009) (finding untimely dispute barred under substantively identical contract provision).[5]

In short, Global Crossing implemented the Concurrence Agreement. UST utilized Star's preferred rates. The only breach UST alleges is that invoices continued to have Star's name on them and that Global Crossing billed two MMUCs. As noted about the former, the name on the bill was, at most, a nuisance. As to the latter, Global Crossing believes it never agreed to waive

---

[5] Plaintiffs make much of the fact that Global Crossing requested financials for both UST and Star before agreeing to combine the two accounts. *See* Motion, pp. 5-7. This is true, but it is a side show. Not only was the dispute untimely, but, despite this request, UST still received the benefit of the bargain it sought in receiving the lower Star rates. This minor dispute involves $129,000 at most, is the subject of a pending motion for summary judgment which is fully briefed and waiting decision, and is a very minor part of this almost five-year old litigation.

one MMUC. But, if Judge Telesca decides that Global Crossing is wrong on that issue, the remedy is a $129,000 credit. Either way, burdensome and expensive discovery after Motion and discovery cutoff is not warranted.

With discovery having ended and Global Crossing's Motion for Summary Judgment fully briefed, Plaintiff's attempt to reopen discovery on a relatively minor discovery issue – an issue UST failed to address during the past 4 years – is nothing but a last-gasp effort to delay the inevitable and should be denied.[6] Instead, the parties should await the Court's decision on Global Crossing's pending summary judgment motion.

## II.   ARGUMENT.

### A.   PLAINTIFFS' APPLICATION FOR LEAVE SHOULD BE DENIED AS PLAINTIFFS HAVE NOT SHOWN GOOD CAUSE AND THE MOTION WOULD BE FUTILE.

Rule 16 provides that a scheduling order "shall not be modified except upon a showing of good cause." Fed.R.Civ.P. 16(b).

As one court has held,

> "[g]ood cause" requires a greater showing than "excusable neglect." At a minimum, good cause requires a showing by the moving party of an objectively sufficient reason for extending a deadline such that the deadlines cannot reasonably be met despite the diligence of the party needing the extension. The inquiry focuses on the moving party's reason for requesting the extension.

*Pyke v. Cuomo*, 2004 WL 1083244, at *2 (N.D.N.Y. May 12, 2004) (internal citations and quotation marks omitted). The Second Circuit has emphasized that "the primary consideration" in determining whether good cause has been shown "is whether the moving party can demonstrate diligence." *Kassner v. 2nd Avenue Delicatessen Inc*, 496 F.3d 229, 244 (2d Cir.2007). Plaintiff has not demonstrated "diligence" during the past four-plus years. Nor has it even attempted to do so other than to blame predecessor counsel. Plaintiff's only explanation for

its inexcusable tardiness in seeking to move to compel the production of emails is that its former attorney failed to provide proper representation.  *See* Motion, pp. 15. Thus, Plaintiff contends that its attorney's misconduct provides a sufficient predicate for the late extension of discovery. As one case held, however, in considering a similar claim where the more lenient "excusable neglect" standard of Fed.R.Civ.P. 16(b) applied:

> Absent extraordinary circumstances, a client assumes the risk of his attorney's actions and is bound even by the consequences of his attorney's negligence." *Chira v. Lockheed Aircraft, Corp.*, 634 F .2d 664, 666-67 (2d Cir.1980); *Gadsden v. Jones Lang Lasalle Americas, Inc.*, 210 F.Supp.2d 430, 436-37 (S.D.N.Y.2002). Claims by a litigant that he should be excused from his attorney's actions because of alleged fraudulent conduct and disobeyance of the litigant's orders may give rise to a claim for malpractice, but does not constitute an extraordinary circumstance or excusable neglect.

*Lastra v. Weil, Gotshal & Manges LLP*, 2005 WL 551996, *4 (S.D.N.Y. Mar. 8, 2005); *accord McCurry ex rel. Turner v. Adventist Health System/Sunbelt, Inc.*, 298 F.3d 586, 595 (6th Cir.2002) ("out-and-out lawyer blunders-the type of action or inaction that leads to successful malpractice suits by the injured client-do not qualify as ....'excusable neglect.' ") (interpreting Fed.R.Civ.P. 60(b)(1) (citations omitted).

Inasmuch as the "good cause" standard is more exacting than the "excusable neglect" standard, "[t]he mistake or inadvertence of counsel **will not support a finding of good cause**." *Pyke*, 2004 WL 1083244, at *2 (citing cases) (emphasis added); *accord O'Connell v. Hyatt Hotels of P.R.*, 357 F.3d 152, 155 (1st Cir.2004) (no good cause where failure to timely move to amend was caused by non-communication between local and lead counsel); *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418-19 (11th Cir.1998) (no good cause to amend complaint to espouse jurisdictionally-valid claim where plaintiff's counsel was not diligent in obtaining facts to aid in

---

6   Indeed, the Court has already ruled that "[n]o further extensions to the discovery deadline will be granted." [Docket No. 130].

1899205.02

jurisdiction); *McCormick v. Medicalodges, Inc.*, 2007 WL 471127, at *2-3 (D.Kan. Feb. 8, 2007) (counsel's unfamiliarity with local rules that lead to missed deadline not good cause for untimely amendment of the complaint); *Carnrite v. Granada Hosp. Group, Inc.*, 175 F.R.D. 439, 447-48 (W.D.N.Y.1997) (deadline missed by attorney's "inadvertence" not good cause for untimely amendment of complaint, even where "[t]he court agrees that Defendants would not be prejudiced by [its] filing"); *cf. Hussain v. Nicholson*, 435 F.3d 359, 363-64 (D.C.Cir.) (no "good cause" to extend Rule 16 deadline despite the court's "sympath[y]" for the plaintiff, who was "the victim of [the former attorney's] negligence," and sympathy for the new counsel, "who has tried hard to salvage her client's case"), *cert. denied*, 127 S.Ct. 494 (2006).

Moreover, "while Rule 26(e) requires a party to supplement or correct disclosure upon information later acquired, that provision does not license parties to freely circumvent deadlines established in the Court's scheduling orders." *Bowman v. Hawkins*, 2005 WL 1527677, *2 (S.D. Ala. Jun. 28, 2005). As aptly noted by the court in *Beller v. United States of America*, 221 F.R.D. 689 (D.N.M.2003):

> To rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could "supplement" existing reports and modify opinions previously given. This practice would surely circumvent the full disclosure requirement implicit in Rule 26 and would interfere with the Court's ability to set case management deadlines, because new reports and opinions would warrant further consultation with one's own expert and virtually require new rounds of depositions. That process would hinder rather than facilitate settlement and the final disposition of the case.

*Id*. at 696. *See also Carter v. The Finely Hospital*, 2003 WL 22232844, *2 (N.D.Ill. Sept.22, 2003) (concluding that "[i]t is disingenuous to argue that the duty to supplement under Rule 26(e)(1) can be used as a vehicle to disclose entirely new expert opinions after the [expert disclosure] deadline established by the court....").

1899205.02

### B. RULE 26(e) DOES NOT REQUIRE GLOBAL CROSSING TO SUPPLEMENT ITS DISCLOSURES.

UST contends that Global Crossing is somehow obligated under Rule 26 to supplement its prior responses to Plaintiffs' First Consolidated Document Requests (the "Document Requests") and Global Crossing's Rule 26 Disclosures by producing "emails or other correspondence between the parties for calendar year 2004." *See* Motion, pp. 19-21. [7]

Rule 26(e) only requires the supplementation of Rule 26(a) disclosures when the documents would be used by the disclosing party "to support its claims or defenses…." Fed. R. Civ. P. 26(a). Global Crossing is not relying on the 2004 Emails to support "its claims or defenses," did not attach any to its Motion for Summary Judgment and does not, therefore, have a duty to supplement. Simply put, there is no basis to compel Global Crossing to supplement its Disclosures with documents it has no intention of using at trial.

Moreover, Rule 26(e) only requires a party to "supplement or correct its disclosure or responses" when the "party learns that in some material respect the *disclosure or response is incomplete or incorrect*, and if the additional or corrective information has not *otherwise been made known to the other parties during the discovery process*…." Fed. R. Civ. P. 26(e) (emphasis added). The Rule is clear that it is triggered only when a response becomes "incomplete" and the "additional information is not otherwise known to the other parties." That is not the case here. Global Crossing's responses to Document Requests Nos. 3, 4 and 25 are complete and correct – Global Crossing produced documents subject to its objections. Nothing has changed since then. As set forth in the Advisory Committee Notes to Rule 26(e), the duty to

---

[7] In fact, Plaintiff really seeks internal emails. *See* Motion, p. 5 (looking for emails between Mr. Anderson and other Global Crossing departments such as the legal or contracts groups). Any emails exchanged with Plaintiffs would already be in their possession.

supplement extends only to information "available at the time of the initial disclosure or response." 2007 Advisory Committee Note to Fed. R. Civ. P. 26(e). As discussed above, and as Dan Anderson testified, the 2004 Emails, which would have been sent to or from him, were not reasonably available to Global Crossing at the time of its Rule 26 disclosures or its responses to the Document Requests. As such, the duty to supplement under Rule 26(e) simply does not apply.[8]

### C. PLAINTIFFS NEVER PREVIOUSLY REQUESTED THE MATERIALS THAT THEY NOW SEEK.

UST is not actually asking Global Crossing to "supplement" anything. Consistent with its desire to start the case over, UST's new counsel is actually seeking brand new discovery. What UST wants is internal Global Crossing emails.

Notably, nowhere cited in UST's 23 page brief are the actual discovery requests, and Global Crossing's responses, set forth:

> 3. Please produce all documents that refer to, relate to, reflect and/or constitute any communications <u>between</u> Global or its representatives <u>and Plaintiffs</u> or representatives of Plaintiffs.
>
> **RESPONSE**:
>
> **In addition to its General Objections, Global Crossing specifically objects to this Request as overbroad and unduly burdensome insofar as it is not limited in scope or in time. Global Crossing further objects to this Request as it seeks documents already in Plaintiffs' possession. Without waiving its specific and general objections, Global Crossing will produce at a mutually convenient time and location, non-privileged documents responsive to this Request in its possession, custody and control.**

---

[8] In fact, the absence of such documents would seem to benefit Plaintiff rather than harm it. UST, at any trial, will argue that Dan Anderson (and Global Crossing) simply invented the financial document requirement and that no such request was ever made as evidenced by the lack of written documentation to that effect.

> 4. Please produce any and all correspondence, whether by traditional mail, overnight delivery or electronic mail, including all drafts and whether sent or not, <u>between Global</u> or its representatives <u>and Plaintiffs</u> or representatives of Plaintiffs.
>
> **RESPONSE**:
>
> **In addition to its General Objections, Global Crossing specifically objects to this Request as overbroad and unduly burdensome insofar as it is not limited in scope or in time. Global Crossing further objects to this Request as it seeks documents already in the possession of Plaintiffs. Without waiving its specific and general objections, Global Crossing will produce at a mutually convenient time and location, non-privileged documents responsive to this Request in its possession, custody and control.**
>
> 25. Please produce all documents that refer to and/or relate to the "Concurrence Agreement" identified in Plaintiffs' complaint, including, without limitation, all documents that refer to and/or relate to the <u>negotiation</u> of that Agreement.
>
> **RESPONSE**:
>
> **Global Crossing will produce at a mutually convenient time and location, non-privileged documents responsive to this Request in its possession, custody and control.**

*See* **Exhibit 9** (emphasis supplied).

Neither Document Request No. 3 nor Document Request No. 4 request *internal* emails between Global Crossing employees and representatives. Document Request No. 3 requests only those emails between Global Crossing and Plaintiffs, while Document Request No. 4 requests only those communications between Global Crossing and Plaintiffs. Plaintiff's contention that Documents Request Nos. 3 and 4 include the documents (if any) that they want Global Crossing to search for is simply not true.

Document Request No. 25 is no different. It requests documents relating to the *negotiation* of the Concurrence Agreement. Its scope is specifically limited and would not include internal emails between Dan Anderson and other Global Crossing employees. Rather, it

11

too would include details of negotiations – *i.e.* documents exchanged between a Global Crossing employee and Plaintiffs.  To the extent such emails exist, Plaintiffs would naturally have them in their possession.

Moreover, the fact that internal Global Crossing emails from 2004 regarding the Concurrence Memorandum were not included in the production was presumably made very clear to UST upon receipt of Global Crossing's Discovery Responses in early 2008 and again in November of 2008 when Dan Anderson testified that any and all communications were lost when his laptop crashed.[9]  *See* Anderson Deposition, pp. 21-22, **Exhibit 10**.  If Plaintiffs wanted Global Crossing to search its archived emails, the time to ask or bring the issue to Global Crossing's attention was some time after Mr. Anderson's deposition.  This demonstrates perfectly why UST's Motion is properly considered a Motion to Compel under Rule 37, not a Motion to Supplement under Rule 26.

Consistent with Global Crossing's objections that the Document Request were burdensome, Global Crossing produced those emails that were available without searching its stored and archived emails.  Frankly, Global Crossing was not even aware until UST's Response to Global Crossing's Summary Judgment Motion that few emails from calendar year 2004 emails produced.[10]  If UST had an issue with Global Crossing's production, Plaintiffs should have moved to compel production (a motion that, by the way, would need to be made under Rule 37 (not Rule 26) before discovery cut-off.  UST failed to do so and, new counsel notwithstanding, it should be held to the litigation choices that it made.  Since the motion cutoff

---

[9]  The actual date of the hard drive failure is unclear as Anderson testifies.  *See* Anderson Deposition, pp. 21-22, **Exhibit 10**.

[10]  In fact, contrary to Plaintiff's assertion, at least one 2004 email was produced to Plaintiffs.  *See* **Exhibit 11**.

1899205.02

date has now passed, UST cannot now seek to compel these documents under the guise of a Rule 26 supplementation. Rule 26(e) simply does not apply and cannot be used to circumvent UST's failure to file a Motion to Compel before the discovery and motion cut-off. If the rule is otherwise, there is simply no meaning to a motion cutoff date.

As a result, UST's Motion to Compel would be futile and application for leave to file it should be denied.[11]

**D.   WERE THE COURT INCLINED TO ORDER PRODUCTION, IT SHOULD SHIFT THE COST OF PRODUCTION TO PLAINTIFF.**

For all of the above reasons, the Court should deny UST's Motion. If, however, the court is inclined to grant the motion, it should require UST to pay the costs of production. Steven Schafer, Global Crossing's Director of Internal Collaboration Services, estimates that it would take Global Crossing a month to search its email archives for emails relating to the Concurrence Memorandum for 2004 and that it would cost Global Crossing $13,000. *See* Steven Schafer Affidavit (**Exhibit 12**). The Court possesses the discretion to issue orders protecting parties from "undue burden or expense." *See e.g., Oppenheimer Fund v. Sanders*, 437 U.S. 340, 358 (1978). In doing so, the Court may issue orders conditioning discovery on the proponent's payment of the discovery costs. *Id*; *see also Zubulake v. UBS Warburg*, 217 F.R.D. 309, 313

---

[11] Regardless, the 2004 emails are irrelevant to whether Global Crossing was obligated to combine the Minimum Monthly Usage Commitments of Star Direct and UST. UST articulates no logical connection between the only "breach" it has alleged and the emails. Moreover, at a minimum, the amount of the dispute was quantified by Plaintiffs at $129,633.00. So, if Judge Telesca determines there are questions of fact concerning this issue in reference to Global Crossing's Motion for Summary Judgment, Global Crossing stated that it would be prepared to credit the amount sought by UST should the Court otherwise enter summary judgment in its favor. *See* Brief in Support of Motion for Summary Judgment, pp. 27-28 [Docket No. 156]. Such a minor dispute (in comparison with the $1.2 million owed by UST), does not justify the extraordinary expense and effort UST wants Global Crossing to bear.

1899205.02

(S.D.N.Y. 2003) (granted protective order shifting costs of email production to requesting party). Given all of the circumstances of this case, if the Court requires Global Crossing to search for the requested documents (that could have and should have been requested years ago), it should require UST to bear the costs of production.

## CONCLUSION

For the reasons discussed above, UST's Application and Motion to Compel should be denied.

                              Respectfully submitted,

                              JAFFE RAITT HEUER & WEISS, P.C.

                              By: /s/ Eric A. Linden
                                    Eric A. Linden (P33249)
                                    Attorney for Defendant Global Crossing
                                    27777 Franklin Road, Suite 2500
                                    Southfield, Michigan 48034
                                    (248) 351-3000

                                    Of Counsel:
                                    Michael J. Shortley, III
                                    Global Crossing Bandwidth, Inc.
                                    1080 Victor-Pittsford Road
Dated: June 1, 2010                       Pittsford, New York 14534

14

1899205.02