UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

STAR DIRECT TELECOM, INC.,
a California corporation, et al.,

              Plaintiffs,

v.

GLOBAL CROSSING BANDWIDTH, INC.,
a California corporation,

              Defendant.

REPORT & RECOMMENDATION

05-CV-6734T

---

**PRELIMINARY STATEMENT**

        Plaintiffs Star Direct Telecom, Inc ("Star Direct") and United States Telesis, Inc. ("U.S. Telesis") have brought this breach of contract action against defendant Global Crossing Bandwidth, Inc. ("Global Crossing"). All three companies provide telecommunication services to other companies and consumers. Among other claims, plaintiffs allege that Global Crossing breached its agreement with them by restricting and thereafter terminating plaintiffs' telecommunications services to the United Kingdom (the "UK traffic"). (Docket # 1). As a result, plaintiffs claim, they were forced to pay higher prices for replacement services from alternative carriers. Global Crossing has filed counterclaims against the plaintiffs arising from their alleged failure to pay Global Crossing amounts owed under their agreement. (Docket # 17).

        Currently pending before this Court is Global Crossing's motion seeking dismissal of plaintiffs' claims and judgment in its favor on its counterclaim as a sanction for plaintiffs' failure to comply with this Court's discovery orders. (Docket # 135). Specifically,

Global Crossing seeks sanctions for plaintiffs' failure to provide certain documents related to the UK traffic (the "UK documents") and for their failure to appear for a deposition noticed pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. (*Id.*). Global Crossing further seeks reimbursement of its attorney's fees and costs associated with the scheduled deposition. (*Id.*).

For the reasons discussed below, I recommend that the district court impose sanctions in the form of a preclusion order prohibiting plaintiffs from presenting evidence in support of certain of their damages claims. In addition, I also recommend that plaintiffs be required to bear jointly and severally the expenses incurred by Global Crossing in connection with the September 10, 2009 deposition.

**FACTUAL BACKGROUND**

I. **Qwest Invoices and the UK Documents**

Since February 2007 Global Crossing has sought from plaintiffs the production of documents relating to their damages resulting from the restriction and subsequent termination of the UK traffic. (*See* Docket # 101-2 at 2). Specifically, Global Crossing has sought documents detailing the amounts that plaintiffs' customers were charged and paid for the UK traffic when those services were provided by Global Crossing, the amounts charged and paid for the UK traffic after Global Crossing restricted and terminated those services and the invoiced amounts charged to plaintiff by alternative carriers to provide replacement services (collectively, "the UK documents"). (*Id.*). Relevant to this motion, those requested documents encompass invoices from alternative carrier Qwest, which plaintiffs and their affiliates used to provide UK traffic to their customers following Global Crossing's restriction and termination of that traffic in 2005. Global Crossing consistently has maintained that those invoices "are necessary to evaluate

[p]laintiffs' claim that they paid higher rates to Qwest for UK termination calls." (Docket # 135-2 at 8).

Global Crossing's pursuit of the UK documents has been the subject of several previous motions before this Court. First, on February 5, 2009, this Court granted Global Crossing's motion to compel plaintiffs to produce the UK documents, among other records. (Docket # 95). Plaintiffs were ordered to produce the documents by February 13, 2009. (*Id*.). Although plaintiffs did produce some responsive documents in a timely manner, they failed to produce the UK documents. (Docket # 101-2 at 5).

On February 23, 2009, the parties agreed to participate in a mediation and to stay all discovery disputes pending mediation. (Docket # 110, Ex. 4). The mediation was held on April 23, 2009 and was unsuccessful. Immediately thereafter, Global Crossing renewed its demand for the UK documents and requested that they be produced by May 4, 2009. (*Id*. at Ex. 5). Plaintiffs failed to produce the UK documents by the requested date.

On May 19, 2009, Global Crossing filed its second motion relating to the UK documents. This motion sought an order precluding plaintiffs from supporting their claims for damages resulting from the restriction of the UK traffic as a sanction for their failure to produce the UK documents. (Docket # 101). On May 22, 2009, plaintiffs produced some of the UK documents, but did not produce invoices from Qwest during 2005, the time period during which Global Crossing restricted and ultimately terminated the UK traffic. (Docket # 121 at 5). On July 13, 2009, this Court denied Global Crossing's motion to preclude, but awarded attorneys' fees as a sanction for plaintiffs' failure to comply with its February 2009 order. (Docket # 115).[1]

---

[1] Plaintiffs' motion for reconsideration of that decision was denied. (Docket # 180).

In addition, this Court extended the discovery deadline to September 14, 2009 for the limited purpose of allowing Global Crossing to notice a Rule 30(b)(6) deposition of plaintiffs and to obtain the outstanding 2005 Qwest invoices. (*Id.*).

On August 5, 2009, plaintiffs produced to Global Crossing 70 CD-ROMs of documents, totaling 60,000 pages. (Docket # 135-2 at 3, 4). On August 31, 2009, Global Crossing advised plaintiffs that their recent production still lacked Qwest invoices from 2005. (*Id.* 4, Ex. G).

On August 26, 2009, plaintiffs' counsel, Technology Law Group ("TLG"), moved to withdraw as counsel. (Docket # 128). On August 27, 2009, during oral argument on a separate issue, I addressed TLG's motion to withdraw and warned counsel that I did not intend to grant any further extensions of the discovery deadline even if TLG were permitted to withdraw.[2] I further directed plaintiffs to submit affidavits affirming their understanding of this Court's admonition. Plaintiffs submitted the requested affidavits on September 9, 2009. (Docket # 132). The affidavits stated, *inter alia*, that plaintiffs understood that the Court would grant no further extensions to the discovery deadlines and that they had instructed TLG to provide no further legal services. (Docket ## 132-2 at ¶¶ 5, 7; 132-3 at ¶¶ 5, 7). I granted TLG's motion to withdraw on September 10, 2009. (Docket # 133).[3]

---

[2] The Court had already extended the deadlines in the original scheduling order five times by the time TLG moved to withdraw. (Docket ## 35, 36, 39, 79, 99).

[3] U.S. Telesis retained new counsel in late September 2009. (Docket ## 138, 140).

4

## II. The Noticed 30(b)(6) Deposition

Meanwhile, Global Crossing also noticed a 30(b)(6) deposition of a representative of plaintiffs relating to the UK traffic restriction. The notice was served on August 19, 2009, and scheduled the deposition for September 10, 2009 in California. (Docket # 135-2 at 3, Ex. E). The notice of deposition requested that the plaintiffs' witness or witnesses be prepared to testify regarding, *inter alia*, "[t]he invoices received by [p]laintiffs or their affiliates from Qwest covering UK-bound traffic for 2004 and 2005 and [p]laintiffs' payment of same." (Docket # 135, Ex. E).

TLG did not respond to the notice. On August 28, 2009, Global Crossing's counsel Eric Linden ("Linden") emailed TLG to confirm the September 10 deposition, but received no response. (*Id.*, Ex. F). On September 4, 2009, Linden again emailed TLG, stating that he assumed that the September 10 deposition would go forward and that he would proceed with making travel arrangements unless he heard otherwise by noon. (*Id.*, Ex. J). At approximately 12:30 p.m., TLG sent Linden an email message stating that plaintiffs had discharged TLG, that TLG could not confirm that anyone would be attending the deposition and advised Linden not to make travel arrangements. (*Id.*). Linden responded that he had already made his travel arrangements and would be flying to California. (*Id.*, Ex. K).

On September 8, 2009, Deborah Ward ("Ward"), the president of Star Direct, emailed Linden about the deposition. She identified herself as the 30(b)(6) witness for plaintiffs and requested that the deposition be rescheduled due to her unavailability on September 10. (*Id.*, Ex. L). She provided no explanation for her unavailability.[4] Linden responded that he could not

---

[4] Ward now has explained that she was unavailable because she needed to transport her father to the hospital for surgery. (Docket # 150-5).

5

communicate directly with Ward because she was represented by counsel, but advised her that he would not reschedule. (*Id*.).

On September 9, 2009, Linden traveled to California for the September 10 deposition. Only he and the court reporter appeared for the deposition. As outlined above, I granted TLG's motion to withdraw on that same day. (Docket # 133).

### III. The Instant Motion

On September 19, 2009, Global Crossing filed the instant motion seeking dismissal of plaintiffs' claims and a default judgment against them on the counterclaim as a sanction for their failure to produce the Qwest invoices or to attend the 30(b)(6) deposition. (Docket # 136). In the alternative, Global Crossing seeks an order striking plaintiffs' claims for damages relating to Global Crossing's restriction of the UK traffic. (Docket # 135-2 at 1). In addition, Global Crossing seeks an order requiring plaintiffs and TLG to pay its attorney's fees and costs incurred in connection with the 30(b)(6) deposition. (*Id*. at 9).

Oral argument on the motion as it relates to U.S. Telesis and TLG was held on November 19, 2009. (Docket # 154).[5] During oral argument, U.S. Telesis produced the 2005 Qwest invoices. (Tr. 42). According to its counsel, U.S. Telesis obtained the invoices directly from Qwest in order to produce them to Global Crossing. (Tr. 42-43).

Oral argument did not proceed at that time on the motion against Star Direct because it had filed for bankruptcy protection on September 22, 2009. (Docket # 137). On February 1, 2010, Star Direct's bankruptcy stay was lifted. (Docket # 178). A motion

---

[5] The transcript of the November 19, 2009 proceeding will be referred to throughout as "Tr. __". (Docket # 159).

scheduling order then issued providing Star Direct an opportunity to oppose Global Crossing's motion. (Docket # 160). Thereafter, local counsel for Star Direct advised this Court that he had been instructed to take no further legal action in this matter. (Docket # 179). Star Direct has filed no opposition to the pending motion.

## DISCUSSION

A court has broad discretion to impose sanctions under Rule 37(b) in the event that a party fails to obey a discovery order. *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002); Fed. R. Civ. P. 37(b). Under Rule 37(b), a court may sanction a party by directing that certain facts be taken as established, "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence," "striking pleadings in whole or in part," dismissing the action or entering a default judgment against the disobedient party. Fed. R. Civ. P. 37(b)(2)(A). "Among the factors to be considered in determining what sanction is appropriate for a willful failure to make discovery are the importance of the information sought; the offending party's record of cooperation in other respects; whether and in what circumstances it ultimately produced the information; the extent of prejudice occasioned by the delay in its production; and public policy aspects of the litigation." *Litton Sys., Inc. v. Am. Tel. and Tel. Co.*, 91 F.R.D. 574, 576 (S.D.N.Y. 1981). The most severe sanctions may be imposed not only to punish the offending party, but also "to deter those who might be tempted to such conduct in the absence of such a deterrent." *Valentine v. Museum of Modern Art*, 29 F.3d 47, 49-50 (2d Cir. 1994) (quoting *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976)).

7

Dismissal of a party's claims or entry of judgment against a party is "an extreme sanction, to be imposed only in extreme circumstances," *Jones v. Niagara Frontier Trans. Auth.*, 836 F.2d 731, 734 (2d Cir. 1987), *cert. denied*, 488 U.S. 825 (1988), and should be supported by a finding of willfulness or bad faith, *Valentine v. Museum of Modern Art*, 29 F.3d at 49. Before imposing the sanction of dismissal, a court should warn the offending party that violation of an order will result in dismissal, *Simmons v. Abruzzo*, 49 F.3d 83, 88 (2d Cir. 1995), and the court should consider whether lesser sanctions would be effective, *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 139 (2d Cir. 2007).

Global Crossing likens plaintiffs' conduct in this case to that of the defendant in *Statue of Liberty-Ellis Island Found., Inc. v. International United Indus., Inc.*, 110 F.R.D. 395 (S.D.N.Y. 1986), in which the court found that default judgment in favor of the plaintiffs was warranted as a result of the defendant's conduct. (Docket # 135 at 7; Tr. 34-35). In *International United Indus.*, the defendant failed to answer the amended complaint, failed to respond to document requests and failed to appear at depositions, including those that had been court-ordered. 110 F.R.D. at 397. In the instant case, by contrast, plaintiffs inexcusably delayed in producing one category of documents and did not appear at one deposition – conduct that does not approach the level of wilfulness at issue in *International United Indus.*, particularly considering plaintiffs' participation in other discovery. Even if it did, however, the court in *International United Indus.* stayed the entry of judgment for forty-five days to permit the defendant one final opportunity to comply with its orders. *Id*. Accordingly, I disagree with Global Crossing that *International United Indus.* counsels in favor of imposing of the harshest sanction against plaintiffs in this case. *See La Barbera v. ASTC Lab., Inc.*, 2007 WL 1423233, *2 (E.D.N.Y. 2007) (rejecting dismissal as too harsh a sanction, but imposing monetary sanction

8

based upon defendants' failure to respond to discovery requests and to comply with order compelling production).

Moreover, Global Crossing has not suggested, and this Court does not find, that plaintiffs acted in bad faith in failing to produce the 2005 Qwest invoices or to attend the September 10, 2009 deposition. Although plaintiffs disobeyed at least two discovery orders by failing to produce the Qwest invoices in a timely manner, they did produce over 60,000 pages during that time period. In addition, although no one appeared for the deposition, counsel for Global Crossing was advised by TLG six days prior to the date set for the deposition that it had been discharged as plaintiffs' counsel. Even though TLG's motion to withdraw did not relieve plaintiffs of their obligation to comply with court orders and deadlines – particularly where, as here, the Court had informed the parties that it did not intend to extend the deadlines – I do not find that plaintiffs' conduct in failing to appear for the deposition amounts to willfulness or bad faith. On the date scheduled for the deposition, plaintiffs were without counsel and, as corporate plaintiffs, were not permitted to appear without counsel. *Jones v. Niagara Frontier Transp. Auth.*, 722 F.2d 20, 22 (2d Cir. 1983) (corporation must be represented by an attorney). Although the Court's earlier admonition was designed to put plaintiffs on notice of their need to secure new counsel prepared to meet the deadlines if they chose to discharge TLG, no evidence exists in the record that their failure to do so was a deliberate strategic ploy. On this record, and considering the absence of any notice to plaintiffs that continued failure to comply with court orders could result in a judgment against them, the most extreme sanction of dismissal would be too severe in this case.

I next address whether plaintiffs' failure to provide the 2005 Qwest invoices warrants an order precluding plaintiffs from presenting evidence on the issue of damages

resulting from the restriction of the UK traffic. A sanction of preclusion is also considered a drastic remedy. *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988) ("[t]he harshest sanctions available are preclusion of evidence and dismissal of the action"); *Outley v. City of New York*, 837 F.2d 587, 590 (2d Cir. 1988) (preclusion of evidence is an "extreme sanction"); *Brick v. CSX Transp., Inc.*, 2007 WL 2580483, *3 (W.D.N.Y. 2007) ("preclusion of evidence for failure to respond to a discovery request is a drastic remedy"). "Although an order . . . precluding a party from presenting evidence . . . is strong medicine, such orders are necessary on appropriate occasions to enforce compliance with the discovery rules and maintain a credible deterrent to potential violators." *Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d. Cir. 1991) (citing *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. at 643 (*per curiam*)).

In the case at bar, Global Crossing filed three motions – a motion to compel and two for sanctions – before plaintiff U.S. Telesis produced the 2005 Qwest invoices at oral argument on the instant motion. These documents are plainly relevant, if not essential, to Global Crossing's ability to evaluate and potentially oppose plaintiffs' claim for damages relating to the UK traffic restriction. Indeed, counsel for U.S. Telesis conceded their importance at oral argument. (Tr. 42). Such late production – nearly three years after they were first requested by Global Crossing – is clearly inexcusable. *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979) ("if parties are allowed to flout their obligations, choosing to wait to make a response until a trial court has lost patience with them, the effect will be to embroil trial judges in day-to-day supervision of discovery, a result directly contrary to the overall scheme of the federal discovery rules") (quoting *Dellums v. Powell*, 566

10

F.2d 231, 235-36 (D.C. Cir. 1977)). Not only must such conduct be fairly sanctioned, but it also must be deterred lest others be tempted to the same abuses.

Remarkably, U.S. Telesis claimed for the first time in its opposition to the pending motion that it did not have possession, custody or control of the Qwest invoices. (Docket # 150 at 3-4).[6] U.S. Telesis thus argues that it should not be sanctioned for not producing documents that it never possessed. (*Id.*). Regardless of whether such a belated representation should be credited, it is undisputed that plaintiffs never objected to the discovery request seeking the invoices on the basis that they did not have them. (Tr. 27, 28). Moreover, it is also undisputed that plaintiffs produced at least some Qwest invoices from 2004. (Docket # 150 at 4, n.4). For these reasons, I decline to excuse the much-belated production on the basis that U.S. Telesis did not possess the documents. Having failed to object, and having defended a motion to compel and a motion for sanctions without ever suggesting that they did not possess the documents, U.S. Telesis waived that objection long ago. *See Land Ocean Logistics, Inc. v. Aqua Gulf Corp.*, 181 F.R.D. 229, 236 (W.D.N.Y. 1998) (failure to object to discovery requests within the thirty-day time frame for a response will result in waiver of the party's objections) (citing *Smith v. Conway Org., Inc.*, 154 F.R.D. 73 (S.D.N.Y. 1994)).

On the record before this Court, I find that a limited preclusion order is justified by plaintiffs' inexcusable inattention to its discovery obligations and repeated disregard of court orders – conduct that rises to the level of gross negligence. Accordingly, I recommend that the district court preclude plaintiffs from offering evidence of damages suffered as a result of the

---

[6] Notably, U.S. Telesis did not contend that it *never* possessed the invoices, and plaintiffs' counsel had suggested at earlier points in the litigation that some documents had been misplaced during an office move. (*See* Tr. 28, 42-43).

rerouting of their UK telecommunications traffic through Qwest, following Global Crossing's restriction and termination of that traffic in 2005. *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d at 72 (upholding magistrate judge's order precluding defendants from presenting evidence as to damages where defendant had repeatedly failed to comply with discovery orders requiring the production of such information); *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp*, 602 F.2d at 1068 (order precluding damages evidence appropriate sanction for grossly negligent failure to comply with discovery orders). In my opinion, however, an order precluding plaintiffs from presenting any claims for damages relating to the restriction of the UK traffic would be unduly harsh and disproportionate to the conduct giving rise to the sanction. Accordingly, plaintiffs should not be barred from presenting their claim for damages resulting from the rerouting of UK traffic through carriers other than Qwest.

Finally, I turn to the question whether plaintiffs should be sanctioned for their failure to produce a 30(b)(6) witness as noticed for the September 10, 2009 deposition. Global Crossing has requested an order requiring that plaintiffs and TLG jointly and severally reimburse it for its expenses incurred in connection with the deposition. Plaintiffs and TLG oppose the request for sanctions on the grounds that Global Crossing needlessly incurred the expenses after it was provided ample notice that the deposition would not proceed. (Docket ## 149 at 6-7; 150 at 6-7).

TLG separately contends that it should not be sanctioned because it was ethically prohibited from attending the deposition. (Docket # 149 at 8-9). At oral argument, TLG represented that after it filed the motion to withdraw, plaintiffs discharged TLG and instructed it not to provide any further legal services. (Tr. 8). TLG then consulted with counsel in three states for advice regarding its ethical obligations to attend the scheduled deposition. (*Id*.). Each

12

counsel advised TLG that because it had been discharged, it could no longer ethically represent or appear on plaintiffs' behalf. (Tr. 9). Thus, TLG contends that the imposition of costs against it would be unjust.

The record establishes that on September 4, 2009, TLG notified Linden that it had been discharged by plaintiffs, it could not confirm that anyone would attend the deposition and Linden should not make travel arrangements. (Docket # 135, Ex. J). At that point, however, Linden had already made his travel arrangements and, in any event, could not have been certain that a representative of plaintiffs would not appear with new counsel. Then, on September 8, 2009, Ward notified Linden that she would not be able to attend the deposition and asked to reschedule. (*Id.*, Ex. L). Linden declined to reschedule and traveled to California from Michigan. At oral argument, Linden explained that he went to the deposition because he could not be sure that no one would appear and he did not want to risk forfeiting his client's right to take the noticed deposition, which was scheduled a mere four days before the court-ordered deadline for completion of discovery. (Tr. 32). In addition, he stated that it was too late to change his travel arrangements by the time he heard from Ward and he believed that Ward might nonetheless appear after he had informed her that he would not reschedule the deposition. (Tr. 33-34).

I conclude that an order reimbursing Global Crossing for its expenses incurred in connection with the deposition is appropriate in light of my express warning to plaintiffs that their attorneys' withdrawal from the case would not result in the extension of any discovery deadlines. I made clear that plaintiffs would bear the consequences of their failure to comply with any court orders. Indeed, representatives of the plaintiffs submitted affidavits affirming their understanding of my admonition and nonetheless joining in their counsel's request to

13

terminate the attorney-client relationship.  Under these circumstances, and considering that plaintiffs were still represented by local counsel on September 10, 2009, who could have defended the deposition, Linden's uncertainty as to whether plaintiffs would in fact appear was justified.  Thus, it is only fair that plaintiffs jointly and severally bear Global Crossing's expenses in connection with the September 10, 2009 deposition.  TLG, by contrast, should not be liable for those expenses because it had been discharged by plaintiffs and had obtained advice of counsel that it could not ethically attend the deposition.

## CONCLUSION

For the reasons discussed above, I recommend that Global Crossing's motion for sanctions **(Docket # 135)** be **DENIED in part and GRANTED in part**.  Specifically, I recommend that the district court (1) deny Global Crossing's request for dismissal of plaintiffs' claims and the entry of default judgment on its counterclaims; (2) grant Global Crossing's request for an order precluding plaintiffs from offering evidence of damages suffered as a result of the 2005 rerouting of their UK telecommunications traffic through Qwest; and, (3) grant Global Crossing's request for an order requiring plaintiffs jointly and severally to reimburse it for the expenses incurred in connection with the September 10, 2009 deposition.  I further recommend that counsel for the parties be directed to confer as to those expenses and to notify

this Court by no later than **August 16, 2010** if no agreement is reached as to the amount of reimbursable expenses.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       July   23  , 2010

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b), 6(a) and 6(e) and Local Rule 72.3(a)(3).

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See e.g. Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**IT IS SO ORDERED.**

                                        *s/Marian W. Payson*
                                        MARIAN W. PAYSON
                                        United States Magistrate Judge

Dated: Rochester, New York
        July   23  , 2010