UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

STAR DIRECT TELECOM, INC. and
UNITED STATES TELESIS, INC.,

                                        REPORT & RECOMMENDATION
                Plaintiffs,             and DECISION & ORDER

        v.                              05-CV-6734T

GLOBAL CROSSING BANDWIDTH, INC.,

                Defendant.

_____

### PRELIMINARY STATEMENT

        Plaintiffs United States Telesis, Inc. ("U.S. Telesis") and Star Direct Telecom,

Inc. ("Star Direct") brought this action against defendant Global Crossing Bandwidth, Inc.

("Global Crossing") alleging breach of contract, claims under Sections 201 and 202 of the

Communications Act, 47 U.S.C. §§ 201 and 202, and various tort claims.  (Docket ## 1, 13).

This Court and the district court have issued several decisions summarizing the various

allegations in this case, and familiarity with those decisions is assumed.  (Docket ## 180, 205,

211, 215, 222).  Currently pending before this Court is U.S. Telesis's motion for sanctions for

Global Crossing's failure to preserve email communications related to the Concurrence

Agreement between the parties.  (Docket # 234).  In addition, Global Crossing has moved to

preclude U.S. Telesis's proposed expert witness from testifying at trial.  (Docket # 238).

        For the reasons discussed below, Global Crossing is ordered to reimburse U.S.

Telesis's attorney's fees and costs in bringing the instant spoliation motion, as well as its

previous motion to compel Global Crossing to supplement its production with emails from 2004.

In addition, I recommend that the district court grant Global Crossing's motion to preclude U.S. Telesis's expert from testifying at trial.

## I.   Plaintiffs' Motion for Sanctions Against Global Crossing

### A.   Facts

#### 1.   Global Crossing's Search for Email Communications from 2004

The instant motion relates to U.S. Telesis's claim that Global Crossing failed to preserve relevant email communications from the year 2004 relating to the Concurrence Agreement. I previously held that any such emails between and among Global Crossing representatives ("internal emails") were relevant and required Global Crossing to search its archived databases and produce any it recovered.[1] (Docket # 222). To comply with the order,

---

[1] Despite plaintiffs' representation that Global Crossing's production also did not include emails between Global Crossing and plaintiffs ("external emails"), the order did not extend to those emails because plaintiffs had retained their own copies of them. (Docket # 222 at 2 n.1).

The emails between the parties that U.S. Telesis produced include the following:

- A May 3, 2004 email between Jeff Daniels of U.S. Telesis and Dan Anderson of Global Crossing concerning the termination of Star Direct's agreement. (Docket # 250, Ex. 19).

- Emails from June 9, 2004 and June 15-17, 2004 between Jeff Daniels, Dan Anderson and Denise Dengel of Global Crossing regarding deferred billing of minimum monthly usage commitment charges until October 2004, including Denise Dengel's transmittal of a revised agreement. (Docket ## 235, Ex. 8; 250, Ex. 20).

- Email from June 28, 2004 between Jeff Daniels and Dan Anderson, with David Lin (of Global Crossing) copied in, concerning revision of account documents to reflect U.S. Telesis's new billing rate. (Docket # 250, Ex. 23).

- A September 30, 2004 email between Jeff Daniels, Dan Anderson and Denise Dengel concerning the deletion of Star Direct's name from invoices sent to U.S. Telesis. (Docket # 235, Ex. 2).

Global Crossing agreed with U.S. Telesis that it would search seven employees' email accounts using sixteen search terms.  The seven employees selected were: Marca Rowley, Dan Anderson, Denise Dengel, Sharon Posadni, David Lin, Barrett MacCheyne and Brad Hagen.  (Docket # 242 at 7).  Of those seven employees, Denise Dengel and Sharon Posadni are still Global Crossing employees.  (*Id*. at 7, nn. 3-8).  Brad Hagen, who left Global Crossing in April 2006, still worked for Global Crossing in December 2005 when plaintiffs commenced this action.  (*Id*. at 8, n.9).  There is no information in the record on this motion regarding whether Dan Anderson is currently an employee of Global Crossing.

Global Crossing produced four batches of emails.  (*Id*. at 8).  According to Global Crossing, "[n]o email communications were found dealing with whether Global Crossing could continue to assess one or two [minimum monthly usage commitment charges ("MMUC"s)] or anything that could reasonably be interpreted as shedding light on that issue."  (*Id*.).

U.S. Telesis states that of the 275 pages of email communications that Global Crossing produced, many are duplicates.  (Docket # 234 at 13).  According to U.S. Telesis, the majority of the emails are to or from Denise Dengel and Dan Anderson.[2]  (*Id*.).  None of the emails produced originated from David Lin or Barrett MacCheyne, and only one each originated from Sharon Posadni and Marca Rowley.  (*Id*.).  U.S. Telesis estimates that Global Crossing has produced twenty-nine non-duplicative emails from 2004.  (*Id*. at 15).

---

[2] Dan Anderson worked as a Carrier Sales Manager.  (Docket # 236, Ex. 27).  During 2004, he had responsibility for Global Crossing's accounts with plaintiffs, facilitated the negotiations between the parties of the Concurrence Agreement and communicated most often with plaintiffs' representatives about it.  (Docket ## 191, Ex. 5 at 13-14; 195 at 12).  Denise Dengel worked as a Senior Contract Administrator for Global Crossing.  (Docket # 236, Ex. 27).

### 2. <u>Global Crossing's Loss in 2005 of Email from 2004</u>

In June 2005, Global Crossing transitioned from using tapes to disks to preserve electronically-stored information and records. (Docket # 242, Ex. J at ¶ 2). At the time of this conversion, Global Crossing discovered that some email communications from the period May through July 9, 2004 were "already corrupted and unreadable" and therefore were not preserved to a disk. (*Id*.). In addition, in 2005 Global Crossing changed the way in which it archived email and, as a result of that change, may have lost email communications from the period September through December 2004. (*Id*. at ¶¶ 4-5).

### 3. <u>The Parties' 2005 Disputes and Litigation</u>

In January 2005 and May 2005, U.S. Telesis submitted disputes to Global Crossing complaining that it was improperly charged two MMUCs. (Docket ## 234 at 4; 242 at 3). Global Crossing denied those disputes in July and November, respectively. (Docket ## 235, Ex. 9; 242 at 4). Between May and December 2005, U.S. Telesis's Vice President of Operations, Stan Hughey, and representatives of Global Crossing discussed possible terms to satisfy U.S. Telesis's outstanding obligations to Global Crossing. (Docket # 242 at 4-5, Ex. F). Plaintiffs filed suit on December 20, 2005. (Docket # 1).

According to Global Crossing, although 2,218 billing disputes were filed with it in 2005, the only parties who commenced litigation were plaintiffs. (Docket # 242, Ex. G at ¶¶ 4, 8). Similarly, in 2006, out of 1,620 billing disputes filed, only two customers initiated litigation. (*Id*. at ¶¶ 4, 9-10).

### 4. **Global Crossing's Collection of Relevant Documents in 2006**

Global Crossing previously submitted an affidavit from Michael Shortley, Esq. ("Shortley"), Global Crossing's Vice President and General Counsel, regarding Global Crossing's preservation efforts.  (Docket # 200, Ex. B).  As I recounted in my previous decision, Shortly affirmed that on January 26, 2006, he directed Global Crossing's Director of Wholesale Collections Department to gather relevant documents, including emails, from current and former customer service and sales managers handling plaintiffs' accounts.  According to Shortley, he thereafter received documents from "appropriate and relevant Global Crossing personnel."  Shortley admits that "Global Crossing did not search for archived electronically stored information in responding to Plaintiffs' discovery demands because of the effort and expense of doing so."  (Docket # 222 at 6) (internal citations omitted).

### B. **Discussion**

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  *See also Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010).  "The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct 'which abuses the judicial process.'"  *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d at 465; *see also Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002) (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 135-36 (2d Cir. 1998)); *Reilly v. NatWest Mkts. Grp., Inc.*, 181 F.3d

253, 267 (2d Cir. 1999) ("[w]hether exercising its inherent power or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses"), *cert. denied*, 528 U.S. 1119 (2000).

A party bringing a spoliation motion must demonstrate that: (1) the party charged with destroying the evidence had an obligation to preserve it; (2) the records were destroyed with a "culpable state of mind"; and (3) the destroyed evidence was relevant to the party's claim or defense. *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d at 107 (citing *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107- 08 (2d Cir. 2001)). *See also Pension Comm.*, 685 F. Supp. 2d at 467; *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 430 (S.D.N.Y. 2009); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003).

### 1. <u>Duty to Preserve</u>

"Identifying the boundaries of the duty to preserve involves two related inquiries: *when* does the duty to preserve attach, and *what* evidence must be preserved?" *Zubulake v. UBS Warburg LLC*, 220 F.R.D. at 216 (emphasis in original). A party is obligated to preserve evidence when it has "notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir.), *cert. denied*, 534 U.S. 891 (2001); *Creative Res. Grp. of New Jersey, Inc. v. Creative Res. Grp., Inc.*, 212 F.R.D. 94, 105 (E.D.N.Y. 2002). Once the duty to preserve has attached, a party should institute a litigation hold and "suspend its routine document and retention/destruction policy." *Toussie v. Cnty. of Suffolk*, 2007 WL 4565160, *7 (E.D.N.Y. 2007) (quoting *Zubulake*, 220 F.R.D. at 218).

6

In this case, Global Crossing's duty to preserve arose when the litigation commenced on December 20, 2005. Although U.S. Telesis contends that Global Crossing reasonably should have anticipated litigation earlier than that – specifically, when it rejected U.S. Telesis's dispute in July 2005 – Global Crossing has shown that billing disputes rarely resulted in litigation. Global Crossing has provided statistics revealing that out of approximately 3,800 billing disputes filed during 2005 and 2006, only three customers (including the plaintiffs) commenced litigation. In addition, Global Crossing has demonstrated that U.S. Telesis continued to negotiate possible payment plans up until December 2005. Accordingly, on this record, I do not find that Global Crossing reasonably should have anticipated litigation before the complaint was filed. Therefore, Global Crossing cannot be responsible for email communications lost prior to that date.

## 2. <u>Culpability</u>

"[A] finding of bad faith or intentional misconduct is not a *sine qua non* to sanctioning a spoliator." *Reilly v. NatWest Mkts. Grp., Inc.*, 181 F.3d at 268. Rather, a finding of gross negligence will satisfy the "culpable state of mind" requirement, as will knowing or negligent destruction of evidence. *Id.*; *Residential Funding Corp.*, 306 F.3d at 108 ("[t]he sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence"); *Zubulake*, 220 F.R.D. at 220 ("a 'culpable state of mind' for purposes of a spoliation inference includes ordinary negligence").

Courts have frequently found that a party's failure to implement a litigation hold at the outset of litigation supports a finding of gross negligence. *See, e.g., Pension Comm.*, 685

7

F. Supp. 2d at 477 (duty to issue litigation hold notice was clearly established by 2004 and failure

to do so thereafter amounts to gross negligence); *Toussie v. Cnty. of Suffolk*, 2007 WL 4565160

at *8; *Chan v. Triple 8 Palace, Inc.*, 2005 WL 1925579, *7 (S.D.N.Y. 2005) ("the utter failure to

establish any form of litigation hold at the outset of litigation is grossly negligent"); *Zubulake*,

220 F.R.D. at 220-21 ("[o]nce the duty to preserve attaches, any destruction of evidence is, at a

minimum, negligent"; failure to preserve backup tapes following initiation of lawsuit was grossly

negligent).  In determining the scope of a litigation hold, counsel should confer with information

technology personnel to determine how records are preserved and the extent of the information

possessed.  *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("[C]ounsel

must become fully familiar with her client's document retention policies, as well as the client's

data retention architecture.  This will invariably involve speaking with information technology

personnel, who can explain system-wide backup procedures and the actual (as opposed to

theoretical) implementation of the firm's recycling policy.").

        Here, no evidence exists in the record demonstrating that Global Crossing ever

instituted any litigation hold, written or otherwise.  Instead, approximately one month after the

litigation was commenced, Global Crossing's General Counsel instructed the Director of

Wholesale Collections to gather relevant documents.  How he defined relevant documents or

identified appropriate custodians remains unclear.  Indeed, no record was made of the custodians

who provided documents.  The record is also bereft of evidence that Global Crossing took any

steps to confirm the adequacy of its collection efforts.

        In addition, Global Crossing knew at the time its duty to preserve arose that

emails from seven months in 2004 (May through July 2004 and September through December

2004) were not retrievable from the company's backup tapes and disks.  In light of this knowledge, U.S. Telesis argues, Global Crossing should have taken steps to preserve the computers of employees who still worked for Global Crossing and were central to the negotiation and implementation of the Concurrence Agreement, including Denise Dengel, Dan Anderson and Sharon Posadni.[3]

I find that Denise Dengel and Dan Anderson likely possessed relevant emails on their individual computers when the litigation was filed.  First, U.S. Telesis's document production reveals that Anderson and Dengel both communicated with U.S. Telesis representatives by email during 2004 concerning the Concurrence Agreement.  Those emails were not preserved or produced by Global Crossing.  Dengel has further admitted that "she did not destroy any e-mails concerning the Plaintiffs. . . [and in 2010] she still had in her computer certain documents relating to Global Crossing's relationship to Plaintiffs, in particular, rate documents, but those documents had already been produced by Global Crossing in connection with responding to Plaintiffs' discovery demands."  (Docket # 200, Ex. B at ¶ 5).  In addition, although Dan Anderson's computer crashed some time before August 16, 2004 (Docket # 242, Ex. H), U.S. Telesis has produced a subsequent email between Dan Anderson and Jeff Daniels in September 2004 concerning the deletion of Star Direct's name from U.S. Telesis's invoices (Docket # 235, Ex. 2).  Global Crossing failed to preserve and produce this email, despite its obvious relevance to plaintiffs' claim that Global Crossing breached the Agreement by continuing to send invoices to Star Direct.  *See Residential Funding Corp.*, 306 F.3d at 108-09

---

[3] A review of the record reveals that Sharon Posadni was a manager in Global Crossing's National Contract Administration.  (Docket # 236, Ex. 7).

("relevant in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence").

Anderson also communicated with Global Crossing employees by email in 2005 concerning his recollection that U.S. Telesis was required to provide updated financial statements to Global Crossing before the Concurrence Agreement would be effectuated.  (Docket # 191, Ex. 23).  Again, only plaintiffs have provided copies of these communications in discovery. Although they are no longer pertinent to plaintiffs' remaining claims,[4] at the time U.S. Telesis filed its motion to compel Global Crossing to search for 2004 email, the dispute over this alleged condition precedent was central to Global Crossing's defense that the Concurrence Agreement was unenforceable.

On this record, I find that Global Crossing acted with gross negligence by failing to implement a litigation hold or, at the very least, to preserve the computers of Denise Dengel and Dan Anderson when the action was filed.  I turn next to the question of the appropriate sanction to be imposed.

### 3.  <u>Appropriate Sanctions</u>

Under Rule 37 of the Federal Rules of Civil Procedure, courts have broad discretion to sanction a party for failing to produce or destroying relevant and discoverable evidence.  *West v. Goodyear Tire & Rubber Co.*, 167 F.3d at 779 (discussing court's authority to

---

[4] As noted in footnote 10, Judge Telesca found that Global Crossing's obligation to implement the Concurrence Agreement was not conditional.  (Docket # 215 at 14 n.1).  The claims remaining in the case after Judge Telesca's decision are: (1) Global Crossing's alleged breach of the Concurrence Agreement by charging two MMUCs; (2) breach of contract by failing to resolve disputes timely and failing to send an invoice only in U.S. Telesis's name; (3) claims under Section 201(b) of the Communications Act, 47 U.S.C. § 201; and (4) fraud by silence.  (Docket # 215).  U.S. Telesis has withdrawn any claim that Global Crossing overcharged for its services or did not give it the benefit of Star Direct's more favorable rate.  (Docket # 251).

impose sanctions under Fed. R. Civ. P. 37 where a party destroys evidence in violation of a court order or under the court's inherent power in the absence of an order); *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d at 436; *Residential Funding Corp.*, 306 F.3d 99 at 107.  Available sanctions include, *inter alia*: (1) an adverse inference jury instruction; (2) a preclusion order; (3) an order striking all or part of the pleadings; and (4) an order dismissing all or part of the action.  Fed. R. Civ. P. 37(b)(2)(A)(i)-(vi); 37(c)(1)(C).  In addition to the sanctions set forth under Rule 37(b), Rule 37(c) authorizes sanctions of attorney's fees or notice to the jury of a party's failure to provide information.  Fed. R. Civ. P. 37(c)(1).

        Although a finding that the moving party has been prejudiced is not a prerequisite to the imposition of sanctions, *Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Emps. and Rest. Emps. Int'l Union*, 212 F.R.D. 178, 229 (S.D.N.Y. 2003), *adhered to on reconsideration by* 2004 WL 1943099 (2004), before awarding "more severe sanctions – such as dismissal, preclusion, or the imposition of an adverse inference – the court must consider . . . whether the innocent party has suffered prejudice as a result of the loss of [relevant] evidence."  *Pension Comm.*, 685 F. Supp. 2d at 467.  Proof of prejudice in this context refers to evidence from which a "reasonable trier of fact could infer that the . . . unavailable evidence would have been of the nature alleged by the party affected by its destruction."  *See Residential Funding Corp.*, 306 F.3d at 109; *Scalera v. Electrograph Sys., Inc.*, 262 F.R.D. 162, 178 (E.D.N.Y. 2009) ("where more severe sanctions are at issue . . . the moving party must show that the lost information would have been favorable to it") (quoting *Chan v. Triple 8 Palace, Inc.*, 2005 WL 1925579 at *8).  Where the evidence has been destroyed or lost through bad faith or "egregious" gross negligence, an inference may be drawn that the missing evidence was unfavorable to the culpable party.

11

*Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 438-39 (S.D.N.Y. 2010) (citing

*Residential Funding Corp.*, 306 F.3d at 109; other citations omitted).

As with many determinations that are intensively fact-bound, "[t]he determination

of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial

judge, and is assessed on a case-by-case basis." *Fujitsu Ltd.*, 247 F.3d at 436.  As the Second

Circuit has observed:

> [T]he applicable sanction should be molded to serve the
> prophylactic, punitive, and remedial rationales underlying the
> doctrine.  The sanction should be designed to: (1) deter parties
> from engaging in spoliation; (2) place the risk of an erroneous
> judgment on the party who wrongfully created the risk; and
> (3) restore the prejudiced party to the same position he would have
> been in absent the wrongful destruction of evidence by the
> opposing party.

*West*, 167 F.3d at 779 (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998))

(internal quotation and citation omitted).

In this case, U.S. Telesis seeks the following sanctions: (1) dismissal of Global

Crossing's claims against U.S. Telesis for unpaid MMUCs and for bills unpaid by Star Direct;

(2) a default judgment on U.S. Telesis's claims for breach of the Concurrence Agreement; (3) an

order precluding Global Crossing from presenting evidence in support of its argument that U.S.

Telesis is liable for Star Direct's unpaid balances; (4) an adverse inference that the evidence that

Global Crossing lost would have been favorable to U.S. Telesis.  (Docket # 234 at 2).  U.S.

Telesis also seeks attorney's fees in the amount of $96,615, which purportedly represents its

work on this motion and its earlier motion to compel Global Crossing to search for 2004 email.

(*Id*.).

Dismissal or entry of judgment against a party is "an extreme sanction, to be imposed only in extreme circumstances," *Jones v. Niagara Frontier Trans. Auth. (NFTA)*, 836 F.2d 731, 734 (2d Cir. 1987), *cert. denied*, 488 U.S. 825 (1988), and should be accompanied by a finding of willfulness or bad faith, *Valentine v. Museum of Modern Art*, 29 F.3d 47, 49 (2d Cir. 1994), as well as consideration of the potential efficacy of lesser sanctions, *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 139 (2d Cir. 2007).  Adverse inference and preclusion sanctions are likewise severe sanctions that should be reserved for egregious conduct or for situations in which the loss of the relevant evidence has so prejudiced the moving party that preclusion or an adverse inference is necessary to restore the moving party to its pre-loss position.  *See*, *e.g.*, *Residential Funding Corp.*, 306 F.3d at 112 (instructing district court on remand to consider monetary sanctions in lieu of adverse inference instruction if no prejudice is found); *West*, 167 F.3d at 780 (an order of preclusion may serve to remedy prejudice suffered from spoliation); *Brown v. Coleman*, 2009 WL 2877602, *3 (S.D.N.Y. 2009) (precluding expert from presenting certain evidence in support of his qualifications as sanction for destroying documents because such a sanction would "mitigate any prejudice to [d]efendants resulting from [their] destruction"); *Toussie*, 2007 WL 4565160 at *9 (declining to order adverse inference instruction where the movant had "not sufficiently demonstrated that the destroyed/lost emails were favorable" to its case); *De Espana v. Am. Bureau of Shipping*, 2007 WL 1686327, *8 (S.D.N.Y. 2007) (same).

Severe sanctions are not warranted in this case because U.S. Telesis has not shown either that Global Crossing's failure to preserve emails from 2004 stemmed from bad faith or egregious gross negligence, or that it has been prejudiced by the loss of the emails.  Although

13

U.S. Telesis has demonstrated that some of the emails between the parties' representatives addressed the issue of deferred billing of the MMUCs, no external emails addressed the critical subject of whether the Concurrence Agreement relieved the plaintiffs of their obligation to pay two MMUCs.  Indeed, only one email between the parties – a September 2004 email between Dan Anderson and Jeff Daniels concerning the removal of Star Direct's name from invoices sent to U.S. Telesis – relates at all to any of the claims remaining in the case.

Finally, U.S. Telesis has presented no deposition testimony or other evidence to demonstrate or even suggest that internal emails relating to the pending claims ever existed and were destroyed.  A review of the twenty-nine internal emails that Global Crossing recently produced reveals that the majority of them are simple transmittal emails.[5]  (*Id*. at Exs. 7, 9, 11-18, 22-29).  The remainder are not apparently relevant to any of the remaining disputes in this case despite the fact that they span the period during which the Concurrence Agreement was negotiated and executed, as well as a three-week period after its execution.  This record simply affords no basis upon which to conclude that U.S. Telesis has been prejudiced by the loss of email communications from 2004, especially where it has copies of such communications between the parties.  *See*, *e.g.*, *Piccone v. Town of Webster*, 2010 WL 3516581, *6 (W.D.N.Y. 2010) (declining to find prejudice where Town possessed its own copies of deleted emails); *Crown Castle USA Inc. v. Fred A. Nudd Corp.*, 2010 WL 1286366, *17 (W.D.N.Y. 2010) (no prejudice where party had produced copies of most of the destroyed emails from another employee's account).

---

[5] Of the twenty-nine emails, Dan Anderson sent or received twenty-three of them, and sixteen were sent or received by Denise Dengel.  (Docket # 236).

Although I decline to impose or recommend the imposition of the more serious sanctions proposed by U.S. Telesis, I do find that monetary sanctions are appropriate to reimburse its fees and costs associated with this motion and its earlier motion to compel. (Docket ## 190, 234).  Global Crossing's inadequate attention to its document preservation obligations resulted in the loss of relevant emails for the critical year during which the Concurrence Agreement was negotiated and executed.  At the time it brought its earlier motion, U.S. Telesis reasonably believed that internal emails might have been exchanged in 2004 and might have been retrievable through a search of Global Crossing's backup disks.  Global Crossing's resistance to that search – which forced U.S. Telesis to incur the expense of a motion to compel – was not justified considering its failure to preserve Anderson's and Dengel's computers at the time the litigation commenced.  Accordingly, Global Crossing shall be required to reimburse U.S. Telesis for its *reasonable* attorney's fees and costs.[6]

## II.  Motion to Preclude U.S. Telesis's Expert

Global Crossing has moved to preclude U.S. Telesis's proposed expert witness, Eric P. Evans ("Evans"), from testifying at trial on the subject of consequential damages suffered by U.S. Telesis as a result of Global Crossing's alleged breach of the Concurrence Agreement. (Docket # 238).  Specifically, Evans is prepared to testify that U.S. Telesis lost profits of approximately $7.7 million from 2006 through 2010 as a result of Global Crossing's purported

---

[6]  This Court cannot conceive of any basis on which it would uphold fees and costs of $96,615, or any sum close to that, as requested by counsel for U.S. Telesis.  Counsel are directed to confer and negotiate the amount of reasonable fees and costs.  Plaintiffs' counsel shall notify this Court in writing by no later than April 13, 2012, whether an agreement has been reached regarding the amount of the reimbursement.

breach.  (Docket # 238, Ex. 4 at 10).  Global Crossing contends that the Concurrence Agreement contains a limitation of liability clause foreclosing U.S. Telesis's request for lost profits, and that U.S. Telesis thus should be precluded from offering Evans's expert opinion at trial.  In the alternative, Global Crossing attacks as speculative the data upon which Evans relies in forming his opinion and also contends that Evans's expert report does not comply with the requirements of Rule 26 of the Federal Rules of Civil Procedure.

A. **Facts**

Like most motions in this case, the instant motion comes before the Court on a convoluted path.  On July 24, 2009, this Court entered an order staying the expert discovery deadlines pending its decision on a separate motion to extend the deadline for completion of fact discovery.  (Docket # 119).  Shortly after that motion was decided (*see* Docket # 130), plaintiffs' counsel moved to withdraw, Star Direct filed for bankruptcy protection and new counsel was retained.[7]  During that time, neither the parties nor the Court revisited the subject of expert discovery; indeed, it was not until over eighteen months later that U.S. Telesis filed a motion to extend the expert discovery deadline.  (Docket # 218).  On April 28, 2011, this Court granted the motion and entered an order permitting plaintiffs to identify an expert.[8]  (Docket ## 230, 241).

---

[7]  These events have been recounted at length in this Court's previous decisions and will not be repeated here.  (*See* Docket ## 205, 222).

[8]  Important to this Court's decision was U.S. Telesis's representation at oral argument on April 26, 2011 that the requested extension would cause little delay because plaintiffs' prior counsel had already retained an expert who had prepared a draft report.  (Docket # 241 at 8-9).  Global Crossing later learned that U.S. Telesis did not retain Evans until May 2011, after the oral argument.  (Docket # 238, Ex. 4 at 5).  After Global Crossing brought this fact to the Court's attention, U.S. Telesis submitted an affidavit from Evans asserting that he had been retained by predecessor counsel in 2009 to provide an opinion on damages in preparation for a settlement mediation.  (Docket # 244 at ¶ 6).  At this Court's direction, counsel subsequently submitted Evans's earlier "report" for *in camera* review.  This Court has reviewed it and finds that it reflects extensive analysis of U.S. Telesis's damages, justifying counsel's representation that little work was necessary to update the report for production to Global Crossing.

Global Crossing, in turn, was granted leave to file the pending motion following its review of the expert report.  (*Id*.).

In his report, Evans opines that Global Crossing's "inability to deliver on the agreed-upon rate terms and conditions of the Concurrence Agreement led to approximately $7.7 million of financial harm [in the form of lost earnings] to [U.S. Telesis] during the five years from 2006 through 2010."  (Docket # 238, Ex. 4 at 10).  More specifically, Evans opines that "had [U.S. Telesis] been allowed to fully implement its business plan, it is reasonable to assume [it] may have earned an additional $7.7 million . . . during the five years from 2006 through 2010."  (*Id*.).  As Evans explains,

> According to Mr. Daniels [of U.S. Telesis], the disputed issues between [U.S. Telesis and Global Crossing] resulted in much higher-than-expected operating costs for the Company.  In addition . . . the prolonged inability of [Global Crossing and U.S. Telesis] to rectify these billing disputes severely diminished [U.S. Telesis's] reputation with its sales force of independent agents.  This ultimately led to a significant impairment of [U.S. Telesis's] ability to grow its customer base and revenues during the critical start-up phase of this new venture.

(*Id*. at 5).  A review of Evans's report reveals that the "billing disputes" to which he refers are the disputes over Global Crossing's refusal to combine the "traffic volumes [of U.S. Telesis and Star Direct] for the purpose of fulfilling the contract's [MMUCs].'"[9]  (*Id*. at 4).

Global Crossing now moves to preclude U.S. Telesis from offering Evans's opinion at trial on the ground that the Carrier Services Agreement contains a limitation of liability clause foreclosing any claim for lost profits, which was not modified or rescinded by the

---

[9]  It is undisputed that Global Crossing did give U.S. Telesis the benefit of Star Direct's more favorable rates.  (Docket # 251 at 2-3).

subsequent Concurrence Agreement.  (Docket # 238).  Specifically, the Carrier Services

Agreement provided, "In no event shall either Party be liable to the other Party for incidental and

consequential damages, loss of goodwill, anticipated profit, or other claims for indirect damages

in any manner related to this Agreement or the Services."  (Docket # 238, Ex. 5 at § 7.3).  The

Concurrence Agreement further provided that none of its terms "should be construed to alter the

terms of the [Carrier] Service Agreements between the Parties."  (Docket # 238, Ex. 6 at § 10).

U.S. Telesis does not dispute the validity of the limitation of liability clause;[10]

rather, it contends that its enforceability presents a question of fact for the jury.[11]  (Docket # 243

at 2).  Specifically, U.S. Telesis contends that Global Crossing acted with such gross negligence

as to render the limitation of liability clause legally unenforceable.  (*Id*. at 13-17).  Global

Crossing counters that the allegations of gross negligence, even if true, do not rise to the level of

gross negligence required to invalidate such a provision.

## B.  Discussion

### 1.  Applicable Legal Standards

Under Rule 702 of the Federal Rules of Evidence, a court may permit testimony

from an expert witness if such testimony "will assist the trier of fact to understand the evidence

or to determine a fact in issue."  Fed. R. Evid. 702.  Rule 401 defines relevant evidence as

"evidence having any tendency to make the existence of any fact that is of consequence to the

---

[10]  The Carrier Service Agreement between the parties provided that New York law would apply to construction and enforcement of the agreement.  (Docket # 238, Ex. 5 at ¶ 16).  Both parties thus agree that New York law governs this dispute.

[11]  In its brief, U.S. Telesis repeatedly asserts that Judge Telesca has already ruled that the enforceability of the limitation on liability clause presents an issue of fact for the jury.  (Docket # 243 at 1, 3, 15).  Plaintiffs are simply wrong.  Nothing in Judge Telesca's summary judgment decision even addresses, let alone decides, that question.

determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.  Thus, if the testimony to be offered by the expert is not relevant to any issue in the case, the expert should not be permitted to testify at trial.  *See* Fed. R. Evid. 402 ("[e]vidence which is not relevant is not admissible").

As the New York Court of Appeals has held, "[a] limitation on liability provision in a contract represents the parties' [a]greement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor." *Metropolitan Life Ins. Co. v. Nobel Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436 (1994).  *See also Deutsche Lufthansa AG v. Boeing Co.*, 2007 WL 403301, *2 (S.D.N.Y. 2007); *Net2Globe Int'l, Inc. v. Time Warner Telecom of New York*, 273 F. Supp. 2d 436, 450 (S.D.N.Y. 2003).  New York law does not permit parties to limit their liability for grossly negligent conduct, however. *MyPlayCity, Inc. v. Conduit Ltd.*, 2011 WL 3273487, *7 (S.D.N.Y. 2011); *Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Publ'g Co.*, 580 F. Supp. 2d 285, 294 (S.D.N.Y. 2008); *Colnaghi, U.S.A., Ltd., v. Jewelers Protection Svcs., Ltd.*, 81 N.Y.2d 821, 823 (1993); *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 384-85 (1983).  This rule serves to ensure that sophisticated parties may predictably rely on courts to enforce clauses limiting liability, but also may have "legal recourse for injuries from particularly malicious behavior." *Industrial Risk Insurers v. Port Auth. of New York and New Jersey*, 387 F. Supp. 2d 299, 307 (S.D.N.Y. 2005).

Courts apply a "more exacting standard of gross negligence" where sophisticated parties have entered into limitation of liability agreements than in other contexts.  *Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Publ'g Co.*, 580 F. Supp. 2d at 294; *see also Deutsche*

*Lufthansa AG v. Boeing Co.*, 2007 WL 403301 at *3 (recognizing that New York courts "set the bar quite high" for exceptions to enforcing an exculpatory clause).  Applying this standard, a clause limiting a party's liability remains enforceable unless a party's conduct "smacks of intentional wrongdoing . . . [o]r, when, as in gross negligence, it betokens a reckless indifference to the rights of others."  *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d at 385.  *Accord Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 554 (1992).  In other words, conduct that amounts to gross negligence in other contexts may not be sufficiently egregious – either in kind or in degree – to warrant voiding an agreed-upon limitation of liability.  *See, e.g., Industrial Risk Insurers v. Port Auth. of New York and New Jersey*, 387 F. Supp. 2d at 307 ("higher standard of 'reckless disregard' [applies] in cases where a party seeks to pursue a claim of gross negligence despite a release of liability"); *Colnaghi, U.S.A., Ltd., v. Jewelers Protection Svcs., Ltd.*, 81 N.Y.2d at 824 (failure of alarm company to wire a skylight might be suggestive of gross negligence in other settings but did not "evince the recklessness necessary" to void an agreement to absolve the parties from liability for negligence); *Stuart Rudnick, Inc. v. Jewelers Protection Svcs., Ltd.*, 598 N.Y.S.2d 235, 236 (1st Dep't 1993) (failure to maintain a security camera in working order was "clearly negligent, and even grossly negligent as used in other contexts," but did not meet gross negligence standard in context of limitation of liability agreement).

As one court has explained, New York courts demand "nothing short of . . . a compelling demonstration of egregious intentional misbehavior evincing extreme culpability: malice, recklessness, deliberate or callous indifference to the rights of others, or an extensive pattern of wanton acts" in order to nullify a limitation of liability provision.  *Net2Globe Int'l, Inc. v. Time Warner Telecom of New York*, 273 F. Supp. 2d at 454.  "Ordinary mistakes or

miscalculations in performing a task will not meet this standard." *Industrial Risk Insurers*, 387 F. Supp. 2d at 307.

Although the question of whether a party acted with gross negligence is generally a question of fact, numerous courts have dismissed such claims finding that a party's alleged conduct did not rise to the level required to abrogate a limitation of liability provision. *See*, *e.g.*, *MyPlayCity, Inc. v. Conduit Ltd.*, 2011 WL 3273487 at *8 (granting partial motion for summary judgment where party had not adduced evidence of "sufficiently egregious" conduct to void limitation of liability provision); *Deutsche Lufthansa*, 2007 WL 403301 at *4 (dismissing claim for damages in excess of those allowed by limitation of liability clause because alleged misconduct "does not reach the level required to invalidate a limitation of liability clause"); *Net2Globe Int'l, Inc.*, 273 F. Supp. 2d at 450 (collecting cases); *Colnaghi*, 81 N.Y.2d at 823 (reversing district court's denial of summary judgment, finding allegations raised no "issue of fact on gross negligence . . . that would vitiate the contractual exoneration provision"); *David Gutter Furs v. Jewelers Protection Svcs., Ltd.*, 79 N.Y.2d 1027, 1028 (1992) (expert opinion that defendant acted with gross negligence by failing to install additional alarm equipment "did not raise an issue of fact whether defendant performed its duties with reckless indifference to plaintiff's rights, and thus the contractual exculpatory and limitation of liability clauses are enforceable"); *Lubell v. Samson Moving & Storage*, 307 A.D.2d 215, 217 (1st Dep't 2003) (granting motion for summary judgment on plaintiff's claims for gross negligence where there was "no indication that defendant's negligence, if any, 'differ[ed] in kind' from acts of ordinary negligence").

21

2. **Analysis**

Here, U.S. Telesis alleges that Global Crossing acted with gross negligence by breaching the Concurrence Agreement, specifically by continuing to charge two MMUCs and failing to remove Star Direct's name from the invoices – the same allegations at issue in U.S. Telesis's claims.  (Docket # 243 at 1).  According to U.S. Telesis, these actions "impacted" its ability to charge its customers properly.  (*Id*. at 7).  In addition, U.S. Telesis contends that Global Crossing willfully and wrongfully rejected its billing disputes by alleging that U.S. Telesis had failed to satisfy conditions that were not in the Agreement.[12]  (*Id*. at 10-11).  Finally, U.S. Telesis contends that Global Crossing's business practices were disorganized and excessively bureaucratic.  (*Id*. at 7, 9).  For example, U.S. Telesis asserts that Global Crossing treated its account like a "hot potato" by passing responsibility for the account from employee to employee. (*Id*. at 2).

Even accepting the allegations as true, they do not depict the type or degree of misconduct sufficient to void the limitation of liability clause.  U.S. Telesis has not identified any conduct by Global Crossing evincing intentional wrongdoing or a reckless indifference to U.S. Telesis's rights.  At most, U.S. Telesis has alleged that Global Crossing failed to perform certain of its duties under the Agreement and that it ineptly administered the implementation of the Agreement.  A party's failure to perform contractual obligations or its performance of them in a sloppy or disorganized manner does not satisfy the standard required for gross negligence in this

---

[12] Specifically, Global Crossing had claimed that it was justified in not implementing the Concurrence Agreement because U.S. Telesis failed to satisfy a condition precedent to submit updated financial information. Judge Telesca rejected this argument in his summary judgment decision and determined that the Concurrence Agreement was enforceable.  (Docket # 215 at 14).

context. *Alitalia Linee Aeree Italiane*, 580 F. Supp. 2d at 294 n.2 (finding that allegations of defendant's refusal to adopt a software fix, company's reorganization resulting in employees performing work with which they were unfamiliar, and failure to follow procedures did not demonstrate "reckless indifference to the rights of others"; granting summary judgment on basis of limitation of liability provision); *Peluso v. Tauscher Cronacher Professional Eng'rs*, 704 N.Y.S.2d 289, 291 (2d Dep't 2000) (engineer's alleged failure to perform adequate agreed-upon property inspection of property did not constitute gross negligence). Significantly, there is no dispute that Global Crossing implemented the most important benefit of the Concurrence Agreement – the transfer to U.S. Telesis of Star Direct's more favorable rates.

In sum, I find that the limitation of liability clause contained in the Carrier Services Agreement was not modified by the Concurrence Agreement and is enforceable. I further find that U.S. Telesis has not raised an issue of fact whether Global Crossing acted with sufficiently egregious gross negligence to abrogate that clause.[13] Accordingly, I recommend that the district court enter an order precluding U.S. Telesis from offering Evans's expert testimony.

## CONCLUSION

For the reasons stated above, U.S. Telesis's motion for spoliation sanctions **(Docket # 234)** is **GRANTED in PART** and **DENIED in PART**. Global Crossing shall reimburse U.S. Telesis for fees and costs incurred in the instant motion, as well as its previous motion to compel (Docket # 190). U.S. Telesis shall notify this Court in writing by no later than

---

[13] In view of this determination, I decline to address Global Crossing's alternative challenges to the adequacy of Evans's report.

April 13, 2012 whether an agreement has been reached with Global Crossing regarding the

amount of the reimbursement.  In addition, I recommend that the district court grant Global

Crossing's motion to preclude U.S. Telesis from offering testimony from its designated expert.

(Docket # 238).


                                                  _s/Marian W. Payson_____
                                                    MARIAN W. PAYSON
                                                    United States Magistrate Judge

Dated: Rochester, New York
         March __22__, 2012

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b), 6(a) and 6(e) and Local Rule 72.3(a)(3).

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See e.g. Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       March __22__, 2012